Joseph C. **STRINGENT,** Wilber Hendrickson, Robert E. Shumaker, and Ronald F. Yerich, Petitioners,

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 17, 1997.
Decided Dec. 31, 1997.

___

John W. Smart, Pittsburgh, for petitioners.

James G. Seaman, Pittsburgh, for intervenor, Sani Dairy.

Before PELLEGRINI and FLAHERTY, JJ., and MIRARCHI, Jr., Senior Judge.

FLAHERTY, Judge.

Presently before this court is Joseph Stringent's (Claimant) petition for review from an order of the Unemployment Compensation Board of Review (Board).[1] The Board affirmed an order of the Unemployment Compensation Referee denying benefits. We affirm.

The Board made the following findings of fact:

1. For purposes of this appeal, the claimant last worked as a plant employee for Sani–Dairy [ (Employer) ] and his last day of work was July 31, 1996.

2. The claimant worked under a collective bargaining agreement (Contract) between the employer and the United Steelworkers of America, Local 12755, District 10 (union) which expired May 15, 1996.

3. The claimant is a member of United Steelworkers of America, Local 12755, District 10, who is representing the claimant and all other co-workers who are claimant [sic] also.

4. Prior to the expiration of the contract, the union and the employer had negotiated for a new agreement, but at the time of the expiration of the contract, no settlement had been reached on the terms and conditions of a new contract.

5. Subsequent to May 15, 1996, the union and the employer had a series of agreements to continue working under the terms and conditions of the pre-existing contract while negotiations continued.

6. The parties were unable to resolve their differences on one particular major issue. The employer informed the union that if it did not change its position on that issue, it would implement its final offer on July 15, 1996.

7. The union sub-director of District 10, representing all of the claimants, was notified by the employer's labor consultant on July 11, 1996, in writing, that the employer was willing to maintain the status quo of the expired labor agreement between the parties dated June 1, 1993 to May 15, 1996 until further notice and to delay implementation of its final offer and was also contacted in person by telephone prior to August 1, 1996.

8. Subsequent negotiations did not lead to any progress. The negotiations broke off some time during the third week of July, 1996. However, the employer was still willing to offer work under the terms of the existing agreement.

---

1. This is a representative appeal. The named claimant, Joseph Stringent, is acting in a representative capacity on behalf of 168 other similarly situated individual claimants. For purposes of disposing of this petition for review, the facts and the legal issues are identical as to all the claimants. There was a "petition for mass appeal" filed by claimants' attorney. See R.R. at p. 7.

9. Because the negotiations had broken off, on July 28, 1996, the union notified the employer that a work stoppage would take place at the employer's premises effective August 1, 1996.

10. The employer again offered to continue to provide work under the pre-existing agreement on July 31, 1996.

11. Because the employer wished to prevent spoilage of its milk product, it began to shut down the plant and send the employees home between 10:30 p.m. and 11:00 p.m. on July 31, 1996. The employees who were working were paid for the hours until the end of their shift at 12:00 a.m.

12. The union, claimant and his co-workers, on August 1, 1996, initiated a work stoppage at the employer's premises and established and maintained picket lines.

13. Neither the claimant nor the union offered to return to work under the previous agreement at any time during the work stoppage.

14. The work stoppage ended on September 19, 1996.

Board's Decision at pp. 1–2.

The sole issue which the Claimant presents for this court's review is "[w]hether or not the Unemployment Compensation Board of Review erred in affirming the decision of Referee Soloman [sic] in denying unemployment compensation benefits to Appellants." (Claimant's brief at p. 4), which is however, further delineated in the body of the brief where, essentially, Claimant argues that

the "status quo" was not maintained by the employer when it would not allow [the employees] to finish their shift after midnight on August 1, 1996, and /or report to work at that time for the beginning of the shift. It is the employer and not the Union which has refused to maintain the status quo.... There is no dispute that the parties had worked after the expiration of the prior contract under the terms and conditions of that contract for a period of approximately 2½ months. Appellants were willing to continue working under the terms and conditions of that contract and, in fact, would have returned to work under those terms and conditions after August 1, 1996. It was the employer who refused to

allow them to continue working under those conditions and, in fact, called off negotiations and threatened to implement a final offer which was concessionary in nature. Under the particular facts and circumstances of this case, Pennsylvania law fully supports the grant of benefits to the Appellants herein because they, not the company, were willing to maintain the status quo.

(Claimant's brief at pp. 7–8). Reading the arguments presented in the Claimant's brief, it becomes apparent that the essential issues presented are whether there was substantial evidence to support the Board's determination that the union rather than the Employer changed the status quo and whether the Board erred as a matter of law in concluding that the actions of the Employer did not constitute a lockout.

 Appellate review of the Board's decision is confined to determining whether necessary findings of fact are supported by substantial evidence, whether errors of law were committed or whether constitutional rights were violated. *Stanley Flagg and Co., Inc. v. Unemployment Compensation Board of Review,* 146 Pa.Cmwlth. 248, 605 A.2d 443 (1992), *appeal denied,* 532 Pa. 648, 614 A.2d 1144 (1992). Furthermore, the Board is the ultimate finder of fact, and questions of credibility and evidentiary weight to be given to conflicting testimony which was found to be credible are matters for the Board as factfinder and not for a reviewing court. *Freedom Valley Federal S & L Association v. Unemployment Compensation Board of Review,* 62 Pa.Cmwlth. 332, 436 A.2d 1054, 1055 (1981). Facts as found by the Board are conclusive upon this court if this court finds that there is substantial evidence in the record to support those findings. *AVCO v. Unemployment Compensation Board of Review,* 105 Pa.Cmwlth. 316, 524 A.2d 531 (1987). In reviewing the record to determine whether there is substantial evidence to support the Board's findings of fact, this court must view the record in a light most favorable to the party which prevailed before the Board, giving that party the benefit of all logical and reasonable inferences deducible from the evidence. *Penn Hills School District v. Unem-*

*ployment Compensation Board of Review,* 496 Pa. 620, 437 A.2d 1213 (1981). Moreover, where as here, there is a work stoppage that exists because of a labor dispute which takes the form of a strike, it is the burden of a claimant to prove that the work stoppage resulted from a lockout and that he is, therefore, entitled to benefits. *Kerner v. Unemployment Compensation Board of Review,* 68 Pa.Cmwlth. 132, 448 A.2d 666 (1982).

■■■ Section 402(d) of the Unemployment Compensation Law,[2] 43 P.S. § 802(d) provides in relevant part that

An employe shall be ineligible for compensation for any week—

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed....

The test for determining whether a work stoppage was caused by a lockout or alternatively, by a strike is set forth definitively in *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 103–04, 242 A.2d 454, 455–56 (1968):

the test of whether a work stoppage resulted from a strike or lockout requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing. As this Court stated in Vrotney Unemployment Compensation Case, [*Appeal of Vrotney*] 400 Pa. 440, 444–445, 163 A.2d 91, 92–94 (1960), the question we must answer to decide on whose shoulders lay the responsibility for the work stoppage is the following:

"Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expir-

ing contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout'.* * * "

Further refinements of this test reveal additional legal principles which are necessary for a proper resolution of the present controversy. As the Superior Court opinion below correctly notes, when, as here, the work stoppage takes the *form* of a strike, the burden is upon the union to show that it made the initial "peace" move by offering to continue the status quo. However, a union need not show that it made the initial peace move by offering to continue the status quo if it reasonably appeared that such an offer would definitely not be accepted by management. This is the so-called "futility doctrine." *Id.* at 104, 242 A.2d at 456. Finally, we note that the question of whether a work stoppage was caused by a lockout or a strike is a mixed question of law and fact. *Miceli v. Unemployment Compensation Board of Review,* 519 Pa. 515, 549 A.2d 113 (1988).

■■■ With these principles in mind, we now consider Claimant's arguments. Claimant first argues essentially that there was not substantial evidence to support the Board's conclusion that the "union disrupted the status quo by calling for a work stoppage at 12:00 a.m. on August 1, 1996, and then establishing picket lines at the employer's premises." (Board's Decision at p. 3). Claimant argues that

even though there is testimony from the company that they were willing to continue working under the terms and conditions of the old contract their actions do not support this contention. The testimony is conflicting at best in that Mr. Martin [Employer's Director of Operations] testifies that there was no offer beyond July 11th while Mr. Zinser [Employer's Chief Contract Negotiator] maintains, absent any writing to confirm it, that such offer was extended as late as July 31, 1996. In any event, while the employees were working prior to midnight on August 1st and subsequent to that time, the employees of Sani Dairy were not permitted to either contin-

**2.** Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended* 43 P.S. §§ 751–914.

ue their shifts and/or report for work. In fact, they were told prior to that time to begin turning in their keys. While there is no dispute that companies are permitted to conduct an orderly shutdown in anticipation of a strike, in this case it is ⋅obvious that the company had no intentions of allowing the employees to return to work at any time after midnight of August 1, 1996. This is completely contrary to Mr. Zinser's contention that they were willing to allow them to continue working under the terms and conditions of the existing contract. The evidence shows that if the Union would have accepted that offer, it would have been rejected. This is supported by the uncontradicted evidence that the plant was locked and that employees were either sent home or not permitted to report for their regularly scheduled shift. Under these circumstances it would have been futile for the Union to make an unconditional offer to return to work....

....

In the instant case, it was the employer, Sani Dairy, who first failed to maintain the status quo. They made it apparent and impossible for employees to continue working after midnight August 1, 1996 and, in fact, never extended an offer for them to continue working under the same terms and conditions of employment which existed prior to that time.

Claimant's brief at pp. 14–16

Claimant concedes, as he must, that there was testimony that the Employer was willing to continue to permit the employees to work under the terms and conditions of the old contract. (R.R. at pp. 61–64). This alone would constitute substantial evidence to support the Board's finding, that the union was notified that the Employer was willing to maintain the status quo of the expired labor contract until further notice. (R.R. at 75,

Letter from Mr. Zinser, representing the Employer, to Mr. Esposito, representing the Union). In addition, there was evidence in the form of an exhibit which would support a conclusion that as of July 29, 1996, the Employer was willing to continue to offer work on August 1, 1996 under the terms and conditions of the former contract.[3] (Certified Record, identified as Exhibit 3 c in the Office of Employment Security proceedings).

The only real evidence which Claimant cites as supporting a contrary conclusion, i.e., that the Employer was not willing to offer continuing work under the terms and conditions of the expired contract was "their actions" in shutting down the plant. However, in the face of the unequivocal notice by the Union after the contract had already expired that it was striking on August 1, 1996, the Employer was permitted to take reasonable steps to protect its interests. *Climax Fire Brick Co. v. Unemployment Compensation Board of Review,* 166 Pa. Superior Ct. 481, 72 A.2d 300, 301 (1950).

In *Climax Brick,* the employer had begun shutting down its plant after the contract had expired and after negotiations which culminated in the union informing the employer that as of a certain date the union would cease work. The union claimed that the shutdown amounted to a lockout and that therefore, the employees were entitled to unemployment compensation. In finding that there was no lockout, the Superior Court reasoned that the union representative therein, Mr. Ferrara informed the employer,

> Climax[,] that "the men will cease work on May fourth." Climax had the right, even if it was not its obligation, to rely upon the positive statement of the Union's representative and claimant's agent. Climax was not bound to act as though no strike would take place in the face of Ferrara's positive

---

**3.** Although the notice by Wilfred B. Young to the Employer's employees only stated that "[i]f you are interested in coming to work, please report at your normally scheduled starting time" and did not state the terms and conditions under which the employees would be working, it is reasonable to infer that those terms and conditions would be that of the expired contract because the last written offer of the Employer stated that the Employer was will-

ing to offer continuing work under the terms and conditions of the expired contract until further notice. There is no evidence that the Employer gave notice otherwise. Moreover, there is testimony by Mr. Zinser that he verbally indicated to Mr. Esposito as late as July 31, 1996 that the Employer was willing to extend work under the terms of the expired contract. (R.R. at pp. 58–62).

assertion to the contrary.... Relying upon his statement, Climax was permitted to make such preparation for meeting the exigency presented by the threatened strike as its managers in the exercise of good faith deemed necessary. It was not required to await the actual and visible refusal of the employers [sic] to return to work.

*Id.* at 485, 72 A.2d at 302. As in *Climax,* so here, we have an Employer faced with the Union's clear declaration of an intent to strike on a date certain. As in *Climax,* where the employer took measures to shut down the plant so as to protect its interests, so here, Employer began to shut down its plant "[b]ecause the employer wished to prevent spoilage of its milk product" (F.F. No. 11, supra), which we conclude was reasonable. Thus, as in *Climax,* the Superior Court concluded such a shut down was not a lockout, so too the Board found herein that Employer's shutting down was not a lockout. We find that there is substantial evidence supporting this finding and we cannot conclude that the Board erred as a matter of law in concluding that such a shutdown was not a lockout.

■ Claimant however, acknowledging that companies are permitted to engage in a shutdown in anticipation of a strike, nevertheless asserts that "in this case, it is obvious that the company had no intentions of allowing the employees to return to work at any time ..." Claimant's Brief at 15. Unfortunately, it was obvious neither to the referee, nor to the Board, nor is it obvious to this court that the Employer had no intention of allowing the employees to work under the terms of the expired contract. Given that what the intentions of the Employer are is primarily a fact question which the Board has, in effect, decided adversely to Claimant, see F.F. Nos. 7, 8, and 10, and for which there is substantial support, this court is bound thereby. As our Supreme Court has stated "[t]hat the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion." *Bowman v. Department of Environmental Resources,* 549 Pa. 69, ——, 700 A.2d 427,

428 (1997), *quoting, Norfolk and Western Railway Co. v. Public Utility Commission,* 489 Pa. 109, 128, 413 A.2d 1037, 1047 (1980). We would exceed our scope of review if we were to reweigh the facts found by the administrative agency rather than terminate our review once we determined that there was substantial evidence to support the agency's findings of fact. Accordingly, we find this argument of Claimant to be without merit.

Moreover, to the extent that Claimant is attacking the Board's finding that the Employer was willing to continue work under the terms of the expired contract on the basis of Claimant's assertion that the Employer's testimony regarding such willingness was contradictory, we are unpersuaded. Claimant suggests that Mr. Martin testified that there was no Employer offer after July 11 to continue work under the terms of the expired contract whereas Mr. Zinser testified that there was. Claimant does not cite any place in the record where Mr. Martin is alleged to have so testified. The only testimony from Mr. Martin, in this regard, is that he did not *know* of any written offers from the Employer after July 11, 1996 to extend work under the terms of the expired contract nor did he *know* of any communications to the employees from the Employer after July 11, 1996 that if the employees returned to work after July 11, they could do so under the terms of the expired contract. (R.R. at pp. 55–56). The mere fact that the Employer's Operations Director does not know of such communications by the Employer's Chief Negotiator is not the equivalent of testimony that there was no offer beyond July 11. Thus, there was no conflict between the testimony of Mr. Martin and Mr. Zinser who testified affirmatively that after the July 11 letter, the Employer did offer to extend work under the terms of the expired contract.

Hence, we find that there is substantial evidence supporting the finding of fact that the Employer offered to provide work on an ongoing basis under the terms and conditions of the expired contract and that its efforts to scale back operations on the night before the

announced strike by the Union was for the purpose of protecting its interests.

■ In addition, we do not find persuasive Claimant's invocation of the futility doctrine. Claimant asserts

the facts show that if the Union would have accepted the [Employer's July 31, 1996 ] offer [to continue to work under the terms of the expired contract], it would have been rejected. This is supported by the uncontradicted evidence that the plant was locked and that employees were either sent home or not permitted to report for their regularly scheduled shift. Under these circumstances it would have been futile for the Union to make an unconditional offer to return to work.

Claimant's Brief at p. 15. In support of its argument, Claimant cites *Effort v. Unemployment Compensation Board of Review*, 125 Pa.Cmwlth. 505, 558 A.2d 571 (1989), as analogous to the case at bar. In *Effort*, the employer therein rejected even the "suggestion of an extension" of the expired contract by the union. *Id.* at 509, 558 A.2d at 573. Accordingly, the *Effort* court found that it would have been futile for the union to make a formal offer to work under the terms of the expired contract.

Unlike *Effort*, the Employer herein repeatedly offered to extend work under terms of the expired contract. The record simply does not support Claimant's assertion that, had the Union accepted the Employer's offer to work under the terms of the expired contract, such an acceptance would have been rebuffed by the Employer. The mere fact that the Employer began a shutdown of its plant does not evidence an intent that it would have rebuffed the Union's acceptance

of continuing under the terms of the expired contract. Once the Union notified the Employer on July 28, that a work stoppage would take place at the Employer's premises effective August 1, 1996, it was necessary for the Employer to shut down the plant prior to midnight of July 31st.[4] Nor does the shutdown render work impossible as the Union intimates. While the shutdown might have caused some employees not to have work on August 1, 1996, work would have nevertheless been available for some of the employees until the milk could "come in off the farms" in a manner of speaking.[5] (R.R. at 56). Accordingly, we reject Claimant's assertion that had it offered to continue to work under the terms of the expired contract such would have been futile.

We conclude that there is substantial evidence supporting the Board's findings of fact. In applying the law to those facts and concluding that the Union and not the Employer was first to change the status quo, we conclude that the Board did not commit any error of law. Accordingly, we affirm.

### ORDER

NOW, December 31, 1997, the order of the Unemployment Compensation Board of Review at No. B–360274, dated April 24, 1997 is hereby affirmed.

LEADBETTER, J., did not participate in the decision in this case.

---

4. The following exchange took place between Claimant's attorney (CL) and Mr. Martin, (EW1):

CL ... you talked about the plant shut down. Of what did the plant shutdown consist, what does that mean shut down?
EW1 Well first of all we can't take any raw milk in, we have to empty all the raw silos out. We have to clean all the equipment within the facility for sanitation reasons. We had to desanitize [sic] there are several different areas in the plant.
CL And that was all done prior to midnight of July 31?
EW1 Yes.

R.R. at p. 56.

5. Moreover, the Board found that the shut down was for the purpose of preventing milk spoliation. F.F. No. 11. Because this shutdown was occasioned by the Union's declaration of its intent to strike as of August 1, 1996, any lack of work due to the fact that it would take some time to get the plant up to full capacity is not compensable because such lack of work was caused by the employees and not by the employer. *See Mosko v. Unemployment Compensation Board of Review*, 199 Pa. Superior Ct. 73, 184 A.2d 395 (1962).